# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

Nº 17-CV-4279 (JFB)

---

MADELINE ALBIZU,

Plaintiff,

VERSUS

NANCY A. BERRYHILL,
ACTING COMMISSIONER OF SOCIAL SECURITY,

Defendant.

---

**MEMORANDUM AND ORDER**
September 28, 2018

---

JOSEPH F. BIANCO, District Judge:

Plaintiff Madeline Albizu ("plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act on July 19, 2017, challenging the final decision of the Acting Commissioner of Social Security (the "Commissioner") denying plaintiff's application for Social Security disability benefits on May 22, 2017. An Administrative Law Judge ("ALJ") determined that plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), with certain limitations. The ALJ found that plaintiff was capable of performing past relevant work, which did not require her to perform work-related activities that were precluded by her residual

functional capacity, and, therefore, that plaintiff was not disabled. The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

Plaintiff now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The Commissioner opposes the motion and cross-moves for judgment on the pleadings. For the reasons set forth below, the Court denies plaintiff's motion for judgment on the pleadings, denies the Commissioner's cross-motion for judgment on the pleadings, and remands the case to the Administrative Law Judge ("ALJ") for further proceedings consistent with this Memorandum and Order.

## I. FACTUAL BACKGROUND

The following summary of the relevant facts is based upon the administrative record ("AR") developed by the ALJ. (ECF No. 8.) A more exhaustive recitation is contained in the parties' submissions to the Court and is not repeated herein.

### A. Personal and Work History

Plaintiff was born on May 1, 1977, and is currently 41 years old. (AR at 29.) She graduated from high school, and worked as a packager of small parts for an electronic components company, as a home caregiver, in customer service at a bakery, and—as her last job prior to stopping work—as a book packager in a warehouse. (AR at 31-33, 144.) In plaintiff's job packaging small electronic parts, she worked standing and sitting, and never had to lift more than ten pounds. (AR at 31.) In her job as a home caregiver she did what she described as "heavy lifting" (AR at 32), and in her last job, as a book packager, she did a lot of heavy lifting—even lifting as much as fifty pounds (AR at 33).

Plaintiff testified before the ALJ in this case that she lived with her fiancé and three children who were (at the time) 5, 10, and 17 years old. (AR at 30.) She testified that her husband supported the family until he was diagnosed with cancer. (*Id.*) Plaintiff stopped working on October 1, 2013 because of a herniated disc in her back, neck pain, and psychological problems (which she said were aggravated by her inability to work due to her back pain). (AR at 34, 43, 143.) Plaintiff indicated in a disability appeal form dated September 9, 2014 that there had been no changes in her daily activities since she last completed a disability report. (AR at 159, 163.)

### B. Relevant Medical History

#### 1. Relevant Physical Medical Evidence

On October 2, 2013, plaintiff visited her primary care physician, Vincent Leddy, M.D., complaining of back pain and breast problems, and seeking a referral. (AR at 329.) Dr. Leddy noted that plaintiff was negative for anxiety and depression (although he also noted that she was taking Prozac and Xanax). (AR at 329, 330.) He noted that plaintiff's neck had full range of motion (AR at 330), and his other physical and mental status examination findings were normal (AR at 330-31). Dr. Leddy noted that plaintiff had neck pain "due to large breasts and bra," and noted morbid obesity. (AR at 331.) On October 18, 2013, plaintiff returned to Dr. Leddy, complaining of congestion and headaches. (AR at 325.) Dr. Leddy again noted normal findings from his physical and mental status examination of plaintiff. (AR at 326-27.)

On December 4, 2013, plaintiff visited Dr. Leddy, complaining of heartburn, neck and back pain, and paresthesia in her upper and lower extremities. (AR at 319.) Dr. Leddy examined plaintiff and found that she had full range of motion, including in her neck, and recorded normal mental status examination findings. (AR at 321.) He noted abnormal electrocardiogram ("EKG") study. (AR at 323.) Dr. Leddy refilled plaintiff's Prozac prescription and ordered a nerve conduction velocity ("NCV") study. (AR at 322-23.) An electromyography ("EMG") study from that day of plaintiff's upper extremities revealed left C6-C7-C8 cervical radiculopathy. (AR at 219-20.)

On December 13, 2013, plaintiff saw Dr. Leddy for a follow-up visit, at which he again noted that his examination findings were normal. (AR at 315-17.) Dr. Leddy ordered a magnetic resonance imaging ("MRI") study of plaintiff's cervical spine. (AR at 317.) On

December 19, 2013, plaintiff had the MRI, which revealed cervical spine disc herniations at C4-C5 and C5-C6 and disc bulges at C6-C7 and C7-T1. (AR at 209.) The report from the MRI states that, otherwise, there were no significant protrusions or abnormalities. (*Id.*) Plaintiff had another follow-up visit with Dr. Leddy on December 23, 2013, at which she requested a letter for her insurance company to get a breast reduction. (AR at 312.) Dr. Leddy again recorded normal findings, but noted plaintiff's current problems (including morbid obesity and cervical radiculopathy). (AR at 312-14.)

On December 27, 2013, Dr. Leddy diagnosed plaintiff with a herniated cervical disc and morbid obesity, and referred her to a pain specialist. (AR at 311.) Plaintiff's examination results were normal, including that plaintiff had a normal gait and full and painless range of motion of all major muscle groups, and no joint tenderness. (*Id.*) Dr. Leddy also recorded normal mental status examination findings. (*Id.*) Dr. Leddy referred plaintiff to a chronic pain specialist. (*Id.*)

On January 6, 2014, plaintiff visited pain management doctor Gregg M. Szerlip, D.O. (AR at 214-15, 226-28.) Plaintiff complained of neck, shoulder, and lower back pain. (AR at 214.) Plaintiff reported that she took Prozac and Xanax for depression and an anxiety disorder, and Advil. (AR at 214, 226.) Dr. Szerlip noted that plaintiff was morbidly obese and had a one-year history of worsening neck pain radiating to the upper extremities, numbness, and lower back pain. (AR at 226.) Dr. Szerlip examined plaintiff and noted that she did not exhibit signs of acute distress, and that she had no difficulty getting onto the examination table. (AR at 228.) He noted that plaintiff had bilateral cervical paraspinal muscle spasms with tenderness to palpation

and trigger points in the cervical region, and muscle spasms with tenderness to palpation and bilateral sciatic notches in the lumbar region. (*Id.*) Neurological findings were normal: Dr. Szerlip noted grossly intact cranial nerves, present and equal upper extremity and patellar reflexes, negative bilateral straight leg raise tests, and the ability to heel-toe ambulate with no difficulty. (*Id.*) Plaintiff had stronger right hand grip strength (which was consistent with her right hand dominance), and she had adequate bilateral shoulder strength to active and passive resistance. (*Id.*) Dr. Szerlip also reviewed plaintiff's December 19, 2013 cervical spine MRI and, after reviewing her records and examining her, diagnosed plaintiff with cervical disc displacement, cervical radiculopathy (pending the results of an EMG/NCV study), and lower back pain. (AR at 226, 228.) Dr. Szerlip informed plaintiff that "she [wa]s definitely a candidate for a series of cervical epidural steroid injections" and he was "making a formal request to Fidelis to embark upon them as soon as possible." (AR at 227.)

On January 16, 2014, Dr. Szerlip saw plaintiff for a follow-up visit and noted that a lower extremity EMG/NCV study done that day "revealed no evidence of lumbar radiculopathy at this time." (AR at 225.) However, he also reviewed the December 4, 2013 EMG/NCV study, and noted that the results demonstrated C6 through C8 radiculopathy, which "definitely corresponds to her chronic neck pain." (*Id.*; *see* AR at 219-21.) Dr. Szerlip made a formal request for authorization for a series of three cervical epidural steroid injections, and prescribed plaintiff Tramadol and physical therapy for her cervical spine. (AR at 225.)

On January 30, 2014, Dr. Szerlip recorded that plaintiff presented for her first cervical epidural steroid injection. (AR at 264.) He noted that plaintiff was told to

return for a follow-up in two weeks, and possibly the next injection. (*Id.*)

On February 11, 2014, plaintiff visited Dr. Leddy complaining of an earache, sore throat, and palpitations. (AR at 305.) Dr. Leddy's examination findings were normal. (AR at 307.) Plaintiff had another follow-up the next day, and her examination findings were again normal. (AR at 303.)

On February 14, 2014, plaintiff returned to Dr. Szerlip for her second cervical epidural steroid injection. (AR at 224.) Plaintiff reported the first injection provided 30% improvement, but she continued to experience pain, and the night before had been "especially 'rough.'" (*Id.*) On February 27, 2013, plaintiff returned for her third cervical epidural steroid injection, and reported an overall 30% improvement in pain after the first two injections. (AR at 223.) Dr. Szerlip diagnosed plaintiff with cervical disc displacement, cervical radiculopathy, and cervical paraspinal muscle spasms, and told her to return in two weeks. (*Id.*)

On March 3, 2014, plaintiff had a visit with Dr. Leddy, at which he noted that she had chronic back and neck pain. (AR at 298.) Dr. Leddy recorded normal findings from his physical and mental status examinations of plaintiff. (AR at 300.) On April 21, 2014, plaintiff visited Dr. Leddy and requested a referral for a neurologist. (AR at 295.) She reported having had breast reduction surgery on March 14, 2014 (*id.*), and was experiencing breast pain (AR at 297). Plaintiff also requested a "note for work explaining her restrictions." (AR at 295.) Dr. Leddy examined plaintiff and noted that her neck and musculoskeletal system were normal, and that she had full, painless range of motion in all major muscle groups. (AR at 296-97.) Plaintiff's mental status was also normal. (AR at 297.) Dr. Leddy noted that plaintiff had lumbar radiculopathy, body mass index of 33.0-33.9, and breast pain.

(*Id.*) He prescribed Augmentin, Motrin, and Omeprazole, and referred plaintiff to a neurologist. (*Id.*)

On May 5, 2014, plaintiff saw Dr. Szerlip and reported 5% relief after her last cervical epidural steroid injection. (AR at 212.) Dr. Szerlip noted that she had breast reduction surgery in the Dominican Republic three months earlier, and was now experiencing severe lower back pain (rated nine out of ten) with weakness radiating into her lower extremities. (AR at 222.) Dr. Szerlip prescribed Tramadol, and noted that plaintiff would return for a follow-up after having an MRI done. (*Id.*)

On May 6, 2014, Dr. Leddy noted that plaintiff visited and complained of lower back pain, and requested a lumbar spine MRI. (AR at 291.) Plaintiff was also experiencing pain in her arms, legs, and neck, and paresthesia in her extremities. (*Id.*) On examination, she had full, painless range of motion. (AR at 293.) Dr. Leddy noted normal physical and mental status examinations findings. (*Id.*) He also noted body mass index of 33.0-33.9, lower back pain, lumbar and cervical radiculopathy, disturbance of skin sensation, and morbid obesity. (*Id.*) He ordered a lower extremity NCV. (*Id.*)

On May 19, 2014, Dr. Leddy reviewed the NCV study results and found lumbar radiculopathy. (AR at 287.) He noted that plaintiff had back pain and paresthesia in her lower extremities. (*Id.*) The results of her physical and mental status examinations were normal. (AR at 289.)

On May 27, 2014, plaintiff had a lumbar spine MRI done, which revealed disc herniation at L2-L3 impressing the thecal sac, disc bulge at L5-S1, thecal sac indentation, and no stenosis, fracture, anterolisthesis, spondylosis, or facet arthrosis. (AR at 211.)

4

On May 30, 2014, Dr. Leddy saw plaintiff and noted that she had lumbar radiculopathy and lower back pain. (AR at 283.) Dr. Leddy noted that his examination findings were normal. (AR at 285.) He again referred plaintiff to a chronic pain specialist. (*Id.*)

On June 9, 2014, Dr. Szerlip saw plaintiff and noted that she was continuing with physical therapy for her cervical spine. (AR at 263.) He reviewed her May 27, 2014 lumbar spine MRI and noted that it revealed lumbar disc displacement, lumbar paraspinal muscle spasms, cervical disc displacement, cervical radiculopathy, and cervical paraspinal muscle spasms. (*Id.*) Dr. Szerlip prescribed Diclofenac, Tramadol, and physical therapy for the lumbar spine. (*Id.*)

On June 10, 2014, plaintiff visited Dr. Leddy to have her disability paperwork completed. (AR at 279.) Dr. Leddy noted that plaintiff's physical and mental status examinations were normal, and she had full range of motion in her neck. (AR at 281.) Dr. Leddy noted a body mass index of 34.0-34.9, herniated cervical disc, lower back pain, hypercholesterolemia, and mild depression. (*Id.*) He referred plaintiff to a pain specialist and neurosurgeon. (*Id.*)

On June 20, 2014, plaintiff saw Masoom Qadeer, M.D., for pain management treatment. (AR at 229-31.) Dr. Qadeer noted that plaintiff had lower back pain precipitated by activities and standing, and relieved by resting. (AR at 229.) Plaintiff reported having occasional weakness when getting up from a seated position. (*Id.*) She also had progressive neck pain, with numbness and a feeling of pins and needles. (*Id.*) She told Dr. Qadeer that the two cervical epidural injections she had gotten "did not help at all." (*Id.*) She said that her lower back pain was now worse than her neck pain. (*Id.*) Plaintiff told Dr. Qadeer that she lived with her husband and children, and enjoyed cooking

and playing with her children. (*Id.*) Dr. Qadeer reviewed plaintiff's MRI of the cervical and lumbar spine, and noted herniated nucleus pulposus ("HNP") for both. (AR at 230.) Plaintiff's physical examination was marked as positive for reflexes and no deficit for sensation. (*Id.*) Plaintiff had painful or restricted ranges of motion of the thoracic and cervical spines. (*Id.*) Plaintiff's straight leg raise tests were painful but not limited. (*Id.*) Plaintiff had paraspinal muscle tenderness and paraspinal spasm on both sides. (AR at 231.) Dr. Qadeer diagnosed plaintiff with lower back and neck pain, lumbar disc displacement, lumbosacral neuritis not otherwise specified ("NOS"), cervical disc displacement, and brachial neuritis NOS. (*Id.*) He told plaintiff to discontinue Tramadol, and prescribed her Relafen, Robaxin, and physical therapy. (*Id.*)

On July 21, 2014, Dr. Qadeer noted that plaintiff reported lower back and neck pain, and that her pain was significant. (AR at 358.) She described it as shooting, throbbing, and tingling. (*Id.*) Plaintiff told Dr. Qadeer that she had been in bed the week before due to pain, and that she was not working. (*Id.*) She reported that sitting or standing aggravated the pain, and resting relieved it. (*Id.*) Plaintiff said that her neck pain was associated with headaches and anxiety. (*Id.*) Dr. Qadeer examined plaintiff and found that she had painful or restricted ranges of motion in her thoracic and cervical spine, as well as paraspinal tenderness and spasm. (AR at 358-59.) Dr. Qadeer again diagnosed plaintiff with lumbar disc displacement, lumbosacral neuritis NOS, cervical disc displacement, and brachial neuritis NOS. (AR at 359.) He noted that a lumbar spine trigger point injection ("TPI") was administered, and referred plaintiff for a psychiatric evaluation. (*Id.*)

On July 24, 2014, plaintiff told Dr. Leddy that Prozac was "not working well for her"

and she felt weak. (AR at 275.) She reported "having panic episodes." (*Id.*) Dr. Leddy's notes indicate that plaintiff's physical and mental status examinations were normal. (AR at 277.) Dr. Leddy noted agoraphobia with panic disorder, obesity, and hypercholesterolemia. (*Id.*) He prescribed Seroquel in addition to plaintiff's prescriptions for Prozac and Xanax. (AR at 277-78.)

On July 31, 2014, Dr. Qadeer administered a lumbar spine steroid injection for lumbar radiculopathy. (AR at 334.)

On August 1, 2014, Andrea Pollack, D.O., performed an internal medicine examination on referral by the Division of Disability Determination. (AR at 238-42.) Dr. Pollack noted that plaintiff reported neck and lower back pain since October 2013, and that she had had physical therapy and cervical epidural steroid injections without relief. (AR at 238.) Plaintiff stated that her pain radiated into her arms and left leg. (*Id.*) She had had neck surgery, which caused numbness in her arms. (*Id.*) She also reported a history of claustrophobia and panic disorder, for which she did not seek treatment but took medication. (*Id.*) Plaintiff reported that her activities included cooking three times a week, showering and dressing daily, and watching television. (*Id.*)

Dr. Pollack examined plaintiff and noted that she had normal gait and stance, could walk on her heels and toes without difficulty, and could squat a quarter of the way down. (AR at 239.) Plaintiff did not need assistance changing for the examination, did not have difficulty sitting on the examination table, and could rise from a chair without difficulty, but could not lie back for the examination. (AR at 239.) Plaintiff had reduced range of motion of the cervical and lumbar spine, hips, and knees. (AR at 240.) Her straight leg raise tests were negative. (*Id.*) Plaintiff had normal neurological function, with equal

deep tendon reflexes. (*Id.*) She had full strength in the extremities, intact hand and finger dexterity, and full (5/5) grip strength. (*Id.*) Plaintiff's cervical spine X-ray showed degenerative changes. (*Id.*) Dr. Pollack diagnosed plaintiff with neck and lower back pain with radiation, panic disorder, and claustrophobia. (*Id.*) She noted that plaintiff had "marked restriction" with squatting, bending, lifting, and carrying, and had "mild to moderate restriction" with pushing, pulling, walking, standing, sitting, climbing stairs, and kneeling. (AR at 240-41.) Dr. Pollack also "suggest[ed] comparison with medical records due to very limited mobility on examination." (AR at 241.)

On August 14, 2014, Dr. Qadeer administered a lumbar spine steroid injection for lumbar radiculopathy. (AR at 333.)

On August 22, 2014, Dr. Leddy saw plaintiff and recorded that his physical and mental status examination findings were normal. (AR at 272.) Dr. Leddy prescribed plaintiff Lipitor and refilled her Seroquel prescription. (AR at 273.)

On September 15, 2014, Dr. Qadeer noted that plaintiff reported her lumbar back pain was "much better" (but still rated at a seven out of ten). (AR at 356.) Plaintiff reported that her neck pain had not changed significantly, and that associated symptoms were headaches and anxiety. (*Id.*) She said that medication helped with the neck pain. (*Id.*) She was not going to physical therapy. (*Id.*) Dr. Qadeer's examination findings and diagnoses were the same as at plaintiff's previous visit. (AR at 356-57.) Dr. Qadeer prescribed Robaxin, Percocet, and Relafen, and noted TPI administered. (AR at 357.) He advised plaintiff to make lifestyle changes, including to improve her diet, work on weight and stress management, and increase physical activity. (*Id.*) On September 25, 2014, Dr. Qadeer administered another

lumbar epidural steroid injection. (AR at 332.)

On October 2, 2014, Dr. Leddy noted that plaintiff visited for a refill of her medications, and presented with right shoulder pain. (AR at 265.) She reported neck and back pain, myalgia, paresthesia in her hands, and anxiety. (*Id.*) Dr. Leddy recorded normal examination findings, except for left trapezius swelling. (AR at 267.) Plaintiff had normal range of motion of the neck, appropriate affect and demeanor, intact recent and remote memory, and good insight and judgment. (*Id.*) Dr. Leddy noted that plaintiff had anxiety, herniated cervical disc, lumbar radiculopathy, shoulder pain, and high cholesterol. (AR at 268.) He refilled plaintiff's Lipitor, Prozac, Abilify, and Seroquel prescriptions. (AR at 269.)

On October 13, 2014, Dr. Qadeer noted that plaintiff's back pain was better after the epidural steroid injection, but her neck pain had not changed significantly. (AR at 353.) She described her neck pain as numbness, pins and needles, and pain radiating to her upper back and arms, and reported that she had headaches and anxiety associated with this pain. (*Id.*) Plaintiff reported that physical activities, such as mopping, sweeping, and household chores, aggravated the pain. (*Id.*) Dr. Qadeer examined plaintiff and found that she had painful or restricted ranges of motion in her thoracic and cervical spine. (AR at 353-54.) Her straight leg raise tests were painful, but not limited. (AR at 353.) Plaintiff had paraspinal tenderness and spasm, and trigger points were palpated over her lumbar and cervical paravertebral muscles. (AR at 354.) Dr. Qadeer prescribed Percocet, Relafen, and Neurontin, and administered a TPI to the trapezius muscles. (*Id.*) He instructed plaintiff to see a spine surgeon and continue with physical therapy. (*Id.*)

On November 10, 2014, Dr. Qadeer noted that plaintiff visited and had continued complaints of lower back and neck pain. (AR at 349.) She reported that she had headaches and anxiety that accompanied her neck pain. (*Id.*) Plaintiff said that the pain was intermittent, and that physical therapy was not helping; in fact, it even aggravated the pain at times. (*Id.*) Dr. Qadeer's examination findings and diagnoses were the same as at prior visits. (AR at 349-50.) Dr. Qadeer administered a lumbar spine TPI, prescribed Neurontin, Relafen, and Percocet, and instructed plaintiff to return in one month. (AR at 350.)

On December 4, 2014, Dr. Leddy noted that plaintiff returned for a medication refill. (AR at 424.) Plaintiff reported ongoing neck and back pain, and anxiety. (*Id.*) Plaintiff told Dr. Leddy that she had an increasing incidence of panic attacks and that she was feeling anxious and stressed. (*Id.*)

On December 8, 2014, Dr. Qadeer wrote that plaintiff said she was doing "fairly well." (AR at 344.) She said that she had good and bad days and "t[ook] it easy on some days." (*Id.*) She reported that any movement or activity increased her pain, and that the pain had radiating symptoms. (*Id.*) Plaintiff stated that she felt tingling and numbness on her neck that radiated to her arm. (*Id.*) She also experienced occasional headaches with increased pain. (*Id.*) Plaintiff told Dr. Qadeer that she enjoyed cooking and playing with children. (*Id.*) Dr. Qadeer noted that plaintiff denied panic disorder, depression, and anxiety. (*Id.*) He examined plaintiff and noted that her cervical and lumbar ranges of motion were restricted or painful, and that she had trigger points with palpation over the lumbar paravertebral muscles. (AR at 344-45.) Plaintiff had tenderness in her neck. (AR at 345.) Plaintiff's straight leg raise tests were painful, but not limited. (*Id.*) Dr. Qadeer diagnosed plaintiff again with lumbar

disc displacement, cervical radiculopathy, lumbosacral neuritis radiculopathy, lumbar facet syndrome, and myalgia and myositis unspecified. (*Id.*) He administered a lumbar spine TPI, prescribed Neurontin and Relafen, and noted that plaintiff was to return in one month for reassessment. (*Id.*)

On February 5, 2015, Dr. Leddy noted that plaintiff complained of left breast pain. (AR at 420.) Dr. Leddy recorded normal examination findings. (AR at 422.) Dr. Leddy noted that plaintiff had breast pain and anxiety. (*Id.*)

On February 23, 2015, plaintiff saw Dr. Qadeer for a follow-up visit, at which she reported that she felt "fairly well," although she still reported pain of five to seven out of ten. (AR at 346.) Plaintiff reported that she was sleeping poorly, was not working, and was not going to physical therapy "as it hurts more." (*Id.*) She reported that movement and activities increased her pain. (*Id.*) Dr. Qadeer examined plaintiff and found that she had tenderness in her neck and lower back, limited range of motion in her lumbar spine and pelvis, and moderate muscle spasm along with palpable trigger points over the lumbar paravertebral muscles. (AR at 347.) Plaintiff's gait was normal. (*Id.*) Dr. Qadeer noted again that plaintiff had lumbar disc displacement, cervical radiculopathy, lumbosacral neuritis radiculopathy, and myalgia and myositis unspecified. (*Id.*) He administered a lumbar spine TPI, prescribed Nabumetone, Neurontin, Pamelor, and Relafen, and instructed plaintiff to return in a month. (*Id.*)

On March 17, 2015, Dr. Leddy noted that plaintiff visited complaining of left wrist pain and throat discomfort. (AR at 416.) Dr. Leddy wrote that plaintiff had acid reflux symptoms, heartburn, and limb pain. (*Id.*) Plaintiff's other physical and mental status examinations were normal. (AR at 417-18.)

On March 18, 2015, plaintiff visited Dr. Leddy for a medication refill and reported that she was having panic attacks, anxiety, and depression. (AR at 413.) The results from Dr. Leddy's physical and mental status examinations were normal. (AR at 414-15.) Dr. Leddy refilled plaintiff's Prozac and Seroquel prescriptions. (AR at 415.)

On March 30, 2015, plaintiff visited Dr. Qadeer complaining that her lower back pain had worsened recently, in particular with the cold weather. (AR at 341.) She reported intermittent pain that was aggravated by any activities, including household activities. (*Id.*) Plaintiff was not going to physical therapy and did not work. (*Id.*) She did not have any new complaints, and the examination results, diagnoses, and medications were the same as at her prior visit. (AR at 341-43.) Dr. Qadeer administered another TPI into plaintiff's lumbar spine, prescribed Nabumetone, Neurontin, and Pamelor, and advised plaintiff to return in a month for a follow-up visit. (AR at 342.)

On May 25, 2015, plaintiff visited Dr. Leddy requesting a Xanax refill and reporting that she had anxiety. (AR at 409.) Dr. Leddy recorded normal examination findings. (AR at 410-11.)

On June 15, 2015, plaintiff saw Dr. Qadeer for a follow-up visit and reported that she was doing well. (AR at 338.) Plaintiff reported that her medication and the TPI were helping her pain. (*Id.*) She continued to have lower back pain, which was aggravated by activities, movement, and rain. (*Id.*) Dr. Qadeer noted that plaintiff's examination showed she had tenderness, moderate muscle spasm, and limited range of motion in her cervical and lumbar spines. (AR at 339.) Dr. Qadeer's neurological tests showed that plaintiff had no gait disturbance and no tremors. (*Id.*) Dr. Qadeer diagnosed plaintiff with cervical and lumbar facet syndrome, and

myalgia and myositis unspecified. (*Id.*) He administered a TPI, prescribed plaintiff Neurontin and Pamelor, and instructed plaintiff to return in a month. (*Id.*)

On June 30, 2015, plaintiff saw Dr. Leddy for an annual examination. (AR at 396-99.) Dr. Leddy noted a systolic murmur; plaintiff's examination results were otherwise normal. (AR at 396.)

On July 16, 2015, plaintiff visited Dr. Qadeer and reported that her pain was still manageable, and that she had no new complaints. (AR at 335.) She reported that her medication and the TPIs "ke[pt] her going." (*Id.*) Plaintiff told Dr. Qadeer that she was not experiencing neck pain, panic disorder, depression, or anxiety. (*Id.*) Plaintiff was not going to physical therapy. (*Id.*) Dr. Qadeer noted that his examination results showed painful flexion and extension of the thoracic spine and restricted range of lateral flexion and rotation of the thoracic spine. (AR at 336.) Plaintiff had a slightly antalgic gait; her straight leg raise tests were painful but not limited; and she had diffuse tenderness in her lower back with limited lumbar range of motion, and moderate muscle spasms and palpable trigger points over her lumbar paravertebral muscles. (*Id.*) Dr. Qadeer again administered a TPI, prescribed Neurontin and Pamelor for myalgia and myositis unspecified, and instructed plaintiff to return in a month. (*Id.*)

On July 28, 2015, plaintiff visited Dr. Leddy requesting a refill of Xanax. (AR at 391.) Dr. Leddy noted that plaintiff had anxiety, but her physical and mental status examination results were normal. (AR at 392-93.) Plaintiff visited Dr. Leddy again the next day to review bloodwork results. (AR at 388.) Dr. Leddy noted that plaintiff had high cholesterol and prescribed plaintiff Lipitor. (AR at 390.)

On August 26, 2015, plaintiff visited Dr. Leddy and reported that she was experiencing acid reflux and heartburn. (AR at 385.) Dr. Leddy noted that plaintiff had gastroesophageal reflux disease (GERD) and mild depression, but the examination findings were otherwise normal. (AR at 386-88.) Dr. Leddy prescribed plaintiff Omeprazole, Prozac, and Seroquel. (AR at 387.) Plaintiff returned for a refill of Xanax on September 1, 2015. (AR at 381.) Dr. Leddy noted again that plaintiff had anxiety, and his examination findings were otherwise normal. (AR at 381-83.)

On September 11, 2015, plaintiff got a prescription from Dr. Qadeer for a walking cane, which Dr. Qadeer noted was for balance. (AR at 380.)

On October 6, 2015, plaintiff visited Dr. Leddy for a refill of her Xanax prescription. (AR at 377.) As at the previous visits, Dr. Leddy noted that plaintiff had anxiety, and his examination findings were otherwise normal. (AR at 377-79.)

On October 14, 2015, plaintiff visited Dr. Leddy, complaining of back pain, and reporting blood in her stool. (AR at 374.) Plaintiff's other examination results were normal. (AR at 375-76.) Dr. Leddy referred plaintiff for an MRI for her lumbar and cervical spines, and for a gastroenterologist to perform a colonoscopy. (AR at 376.)

On October 23, 2015, plaintiff had the MRI scan taken. (AR at 363.) The cervical spine scan showed: C4-C5 disc herniation with cord impingement and foraminal extension impinging existing C5 nerve root; C5-C6 disc herniation effacing the ventral cervical spinal fluid space, without foraminal impingement; C6-C7 disc herniation partially effacing ventral cervical spinal fluid space; and straightening of the cervical lordosis. (AR at 363-64.) The lumbar spine MRI showed: L5-S1 disc herniation with thecal

sac deformity; L2-L3 disc bulge; and an ovarian cystic mass. (AR at 365.)

On November 4, 2015, Dr. Leddy reviewed plaintiff's MRI findings and noted that plaintiff had paresthesia in her upper extremities, but that plaintiff's other physical and mental status examinations results remained unremarkable. (AR at 371-73.) Dr. Leddy referred plaintiff to a chronic pain specialist. (AR at 373.)

On November 5, 2015, plaintiff returned to Dr. Leddy for a refill of her Xanax prescription. (AR at 367.) Dr. Leddy noted that plaintiff had anxiety, and her physical and mental status examinations results were normal. (AR at 367-69.) Dr. Leddy noted that plaintiff's neck was supple with full range of motion, that her musculoskeletal examination revealed grossly normal muscle tone and strength, full and painless range of motion of all major muscle groups and joints. (AR at 369.) He noted that plaintiff was alert and oriented, and had appropriate affect, intact memory, and good judgment. (*Id.*)

On March 28, 2016, plaintiff visited Dr. Qadeer and reported she passed out the day before when her pastor touched her head in church. (AR at 433.) She did not go to the emergency room, but said that she was anxious but stable, and had driven herself to the appointment that day. (*Id.*) Plaintiff reported that she had her usual neck and back pain, occasional headaches, numbness, and tingling. (*Id.*) Plaintiff's examination results showed that her cervical range of motion was moderately painful at "extremes of motion" and slightly restricted, with slight tenderness of her paraspinal muscles, moderate muscle spasm, and trigger points. (AR at 434.) Plaintiff also had paraspinal spasm, tenderness, muscle spasm, and trigger points in the lumbar region. (*Id.*) Plaintiff's neurological examination results were normal. (*Id.*) Dr. Qadeer diagnosed plaintiff with radiculopathy in the cervical and lumbar regions, panniculitis affecting regions of her neck and back, and myalgia. (*Id.*) Dr. Qadeer administered a TPI into plaintiff's trapezius muscles, prescribed plaintiff Nabumetone and Pamelor, encouraged a healthy lifestyle and physical therapy, and instructed plaintiff to return in about a month. (AR at 434-35.)

On May 23, 2016, plaintiff visited Dr. Qadeer for her follow-up, at which she was accompanied by her husband, and reported that the week before she had "excruciating" pain and "could hardly move." (AR at 430.) Plaintiff reported that medication did not help much, but that the injections and TPIs helped "take the edge off." (*Id.*) She reported that her neck pain did not bother her much. (*Id.*) Dr. Qadeer noted that plaintiff did not show signs of serious depression. (AR at 431.) Dr. Qadeer examined plaintiff and found that she had moderately painful cervical flexion and extension, significantly painful thoracolumbar flexion and extension, and slightly restricted cervical and thoracolumbar lateral flexion and rotation. (*Id.*) Dr. Qadeer examined plaintiff's neck and found slight tenderness, fair range of motion, some pain at "extremes of motion," moderate muscle spasm, and palpable trigger points. (*Id.*) Plaintiff had paraspinal spasm and tenderness in her lower back, moderate muscle spasm with palpable trigger points, slightly restricted range of motion of lumbar spine and pelvis, particularly with flexion. (*Id.*) Plaintiff had no gait disturbance. (*Id.*) Dr. Qadeer diagnosed plaintiff with radiculopathy in the lumbar and cervical regions, panniculitis affecting regions of neck and back, and myalgia. (*Id.*) Dr. Qadeer administered a TPI in the lumbar muscles, prescribed plaintiff Nabumetone, Norco, and Pamelor, and encouraged a healthy lifestyle and physical therapy. (AR at 431-32.)

## 2. Relevant Mental Health Medical Evidence

On July 2, 2014, plaintiff visited Paul Herman, Ph.D., for a psychiatric evaluation. (AR at 232-35.) Dr. Herman noted that, at that time, plaintiff lived with her boyfriend and three children. (AR at 232.) Plaintiff informed Dr. Herman that she left her last job as a warehouse worker in 2013 due to medical difficulties. (*Id.*) Dr. Herman noted that plaintiff reported that she did not like being in small and enclosed spaces, and that she did not sleep well due to pain, medical issues, and a sense of claustrophobia and panic when she awoke in the middle of the night. (*Id.*) Dr. Herman also noted that plaintiff had a normal appetite. (*Id.*) Plaintiff reported that she would wake up "feeling closed in . . . almost as if someone [wa]s following her." (*Id.*) When plaintiff felt "panicky," she had trouble breathing, felt shaky, and said that she felt as if she was "about to die." (AR at 232-33.) She had been experiencing these symptoms for several years, but had been able to maintain employment, and first sought treatment only about a year earlier. (AR at 233.) Plaintiff denied having significant difficulties with activities of daily living due to psychiatric or psychological issues (although she said that her medical issues interfered with these activities). (AR at 234.) Plaintiff said that she did not have many friends, but she had good relationships with her family. (*Id.*) She said that she spent most of her time watching television and taking care of her children. (*Id.*)

Dr. Herman performed a mental status examination and found that plaintiff was cooperative with adequate social skills, and that she had normal posture, motor behavior, eye contact, and thought processes. (AR at 233.) Dr. Herman wrote that plaintiff's speech was "adequate for purposes of the evaluation," but noted that English was her second language. (*Id.*) He wrote that plaintiff's affect was "somewhat bland," her mood was neutral, her sensorium was clear, and she was fully oriented. (*Id.*) Plaintiff exhibited below average attention, concentration, and memory skills. (AR at 234.) With regard to plaintiff's cognitive functioning, Dr. Herman wrote that her "[g]eneral fund of information [was] appropriate to experience," and she displayed "[f]air to good" insight and judgment. (*Id.*) Dr. Herman diagnosed plaintiff with panic disorder and claustrophobia. (AR at 235.) Dr. Herman found that plaintiff's mental impairments did not appear to significantly limit her abilities to follow, understand, and perform simple directions, instructions, and tasks; maintain attention and concentration; maintain a regular schedule; learn new tasks; make appropriate, simple work-related decisions; and relate adequately with others. (AR at 234.) He found that plaintiff had "moderate to marked limitation[s]" with respect to her abilities to perform complex tasks and appropriately deal with stress. (*Id.*) Dr. Herman found that the results of the examination were "consistent with psychiatric problems, but in and of themselves, they did not appear to be significant enough to interfere with [plaintiff's] ability to function on a daily basis to the extent that vocational functioning would be precluded." (*Id.*) Dr. Herman recommended vocational training, individual psychological therapy, continuation of psychiatric medications, and assistance managing funds. (AR at 235.)

On July 14, 2014, state agency psychological consultant Dr. E. Selesner reviewed the record, including Dr. Herman's report. (AR at 61-63, 236-37.) Dr. Selesner concluded that plaintiff was not significantly limited in her abilities to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; perform activities within

a schedule; maintain regular attendance; be punctual; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to supervisors' criticism; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places; use public transportation; set realistic goals; and make plans independently. (AR at 61-62.) Dr. Selesner concluded that plaintiff was moderately limited in her abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and interact appropriately with the general public. (*Id.*)

On September 15, 2015, plaintiff completed a medication assessment tool and indicated that she took Xanax, Seroquel, and Prozac. (AR at 259.)

On October 19, 2015, plaintiff saw nurse practitioner ("N.P.") Christine O'Brien for an initial psychiatric evaluation. (AR at 254.) O'Brien noted that plaintiff had experienced depression and had anxiety and panic attacks since childhood. (*Id.*) In connection with her appointment with O'Brien, plaintiff completed a mood disorder questionnaire, in which she indicated that there had been a period of time when she was not her usual self and was much more talkative or spoke much faster than usual; had racing thoughts;

and was easily distracted to the point that she had trouble concentrating or staying on track. (AR at 250.) Plaintiff indicated that these issues were a "minor problem" for her. (*Id.*) Plaintiff completed a "Beck Anxiety Inventory" form, for which she received an overall score of 39, indicating a "potential cause for concern." (AR at 251.) In a patient health questionnaire, plaintiff indicated that the following were applicable for her: having little interest or pleasure in doing things; feeling down, depressed, or hopeless; having trouble sleeping; feeling tired or having little energy; having a poor appetite or overeating; feeling bad about herself; having trouble concentrating; and moving or speaking slowly or being more fidgety or restless than usual. (AR at 252.) She reported that, in the four weeks before completing this form, she had an anxiety attack. (*Id.*) She also indicated that these problems did not cause any difficulty at all with regard to working, taking care of things at home, or getting along with others. (AR at 253.) Plaintiff had been treated by Dr. Leddy for panic and depression and had not been hospitalized. (AR at 254.) O'Brien noted that plaintiff's appearance was appropriate and she made good eye contact. (AR at 255.) She described plaintiff's mood as "happy." (*Id.*) O'Brien indicated that plaintiff was cooperative, and had normal motor activity. (*Id.*) She also noted that plaintiff became agitated when speaking about "a man behind her," which O'Brien noted was evidence of visual hallucinations and paranoid delusions. (*Id.*) Plaintiff had soft, slow, and clear speech. (*Id.*) Her affect was blunted. (*Id.*) O'Brien noted that plaintiff had adequate impulse control, was fully oriented, and had intact memory. (*Id.*) Plaintiff exhibited limited insight and poor judgment. (*Id.*) O'Brien diagnosed plaintiff with panic disorder, noted rule out schizophrenia, and prescribed Seroquel. (AR at 256, 261.)

On November 2, 2015, plaintiff visited O'Brien again, and O'Brien noted that she was alert, her appearance was neat and clean, and she exhibited full orientation, appropriate behavior, cooperative attitude, and normal psychomotor activity and thought processes. (AR at 258.) Plaintiff had an anxious and fearful mood, with congruent and blunted affect. (*Id.*) She had continued visual hallucinations, and poor insight and judgment, but good impulse control. (*Id.*) O'Brien prescribed Klonopin and an increased dosage of Seroquel. (AR at 258, 262, 370.)

On November 30, 2015, O'Brien evaluated plaintiff again and noted—as at the last visit—that plaintiff was alert, her appearance was neat and clean, and she exhibited full orientation, appropriate behavior, and cooperative attitude. (AR at 257.) At this visit, however, O'Brien noted that plaintiff exhibited fidgety psychomotor activity and intense affect, and that her mood was "sad at times—up [and] down." (*Id.*) Plaintiff's speech was rapid but clear, coherent, and spontaneous, and her thought content was normal. (*Id.*) Plaintiff reported decreased delusions and paranoia that a man was following her. (*Id.*) Her insight and judgment were poor and impulse control good. (*Id.*) Plaintiff reported decreased panic and that her sleep was "okay." (*Id.*) O'Brien increased plaintiff's Seroquel dose and prescribed Klonopin and Prozac. (AR at 257, 260.)

On December 17, 2015, O'Brien completed a medical source statement of ability to do work-related mental activities form. (AR at 243-49.) She noted that plaintiff had moderate ability to follow work rules; relate to co-workers; interact with supervisors; and maintain attention and concentration. (AR at 244.) She had poor to no ability to deal with the public; use judgment; deal with work stress; and function independently. (*Id.*) O'Brien explained that plaintiff had trouble concentrating, secondary to anxiety, panic, and claustrophobia. (*Id.*) She noted that plaintiff was often irritable, was easily distracted, and had racing thoughts. (*Id.*) O'Brien also noted that plaintiff had poor insight and judgment, and concluded that working would be very difficult for her. (*Id.*) O'Brien indicated that plaintiff had moderate limitations in her abilities to understand, remember, and carry out simple job instructions. (AR at 245.) She indicated that plaintiff had marked limitations in her abilities to understand, remember, and carry out both incomplete and complex job instructions. (*Id.*) O'Brien noted that plaintiff was paranoid and unable to keep up with activities of daily living. (*Id.*) At times, plaintiff was unable to function and/or leave the house. (*Id.*) Plaintiff had moderate limitations in maintaining her personal appearance. (*Id.*) She had marked limitations in her abilities to behave in an emotionally stable manner; relate predictably in social situations; demonstrate reliability; and maintain a schedule in a daily routine. (*Id.*)

O'Brien noted that plaintiff's symptoms of depression included loss of interest in almost all activities; weight change; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; hallucinations, delusions, or paranoid thinking; hyperactivity at times; pressured speech; flight of ideas; easy distractibility; involvement in activities with a high probability of painful consequences which are not recognized; and bipolar syndrome with a history of episodic periods manifested by full symptomatic picture of both manic and depressive syndromes. (AR at 246-47.) O'Brien indicated that, as a result of these symptoms, plaintiff had marked restrictions in completing activities of daily living; marked

difficulties in maintaining social functioning; marked difficulties maintaining attention and concentration; and repeated episodes of decompensation, each of extended duration. (AR at 247.) O'Brien noted that plaintiff decompensated often and could not manage her activities of daily living, secondary to bipolar disorder, with symptoms of past psychosis, fear, anxiety, and panic. (AR at 247-48.) She determined that plaintiff could not manage benefits in her own interest. (AR at 248.)

On December 28, 2015, O'Brien evaluated plaintiff and again noted that she and was alert, neat, clean, and fully oriented. (AR at 429.) Plaintiff's behavior was appropriate, and she had a cooperative attitude and congruent affect, and normal psychomotor activity. (*Id.*) Her speech was clear and coherent, her thought processes were normal, and her impulse control good. (*Id.*) O'Brien again found that plaintiff's insight and judgment were poor, and her mood was depressed and anxious. (*Id.*) Plaintiff again had decreased feelings that a man following her, and decreased anxiety, but she was sad at times. (*Id.*) Overall, however, she reported that she felt an improvement. (*Id.*)

On January 26, 2016, plaintiff saw O'Brien and reported feeling frustrated and aggravated because her daughter told her she was "too loud." (AR at 428.) Otherwise, O'Brien noted that plaintiff felt an improvement, and was sleeping better. (*Id.*) She was going to church and helping her sister at day care. (*Id.*) O'Brien found that plaintiff was alert, neat, clean, and fully oriented. (*Id.*) Her behavior was appropriate and she had a cooperative attitude. (*Id.*) Her mood was "very good," and her affect was congruent to her mood. (*Id.*) Plaintiff had clear, coherent, and spontaneous speech. (*Id.*) Her thought processes and content were normal. (*Id.*) She had decreased feelings that

there was a man behind her. (*Id.*) She denied suicidal or homicidal ideation and her impulse control was good. (*Id.*) Plaintiff had poor insight and judgment. (*Id.*)

On February 23, 2016, O'Brien noted again that plaintiff was alert, neat, clean, and fully oriented. (AR at 427.) Her behavior was appropriate, her attitude cooperative, and her thought processes and content normal. (*Id.*) Her mood was "up [and] down," but her speech was clear, coherent, and spontaneous. (*Id.*) She had decreased hallucinations of that a man was behind her. (*Id.*) She denied suicidal or homicidal ideation (as at the other visits). (*Id.*) Her thought processes and content were normal. (*Id.*) She had good impulse control, but poor insight and judgment. (*Id.*) Plaintiff reported that she felt an overall improvement and slept well. (*Id.*) O'Brien continued plaintiff's medications without adjustment. (*Id.*)

On March 22, 2016, O'Brien noted again that plaintiff was alert, neat, clean, and fully oriented. (AR at 426.) Again, plaintiff's behavior was appropriate, her attitude was cooperative, she had normal psychomotor activity, and she denied suicidal or homicidal ideation. (*Id.*) Plaintiff's speech was clear, coherent, and spontaneous. (*Id.*) O'Brien noted that plaintiff was sad and weeping, and explained that this was because she felt a man was following her. (*Id.*) She had called an ambulance because of this hallucination, but did not go to the hospital. (*Id.*) O'Brien noted that plaintiff had visual hallucinations, but her thought processes and content were otherwise normal. (*Id.*) Her impulse control was good, but her insight and judgment were poor. (*Id.*) O'Brien increased plaintiff's Seroquel dosage. (*Id.*)

On April 19, 2016, O'Brien again found that plaintiff was alert, neat, clean, and fully oriented. (AR at 425.) Her behavior was appropriate and attitude cooperative. (*Id.*) She displayed normal psychomotor activity,

a "happy" mood, and a congruent affect. (*Id.*) Plaintiff denied hallucinations or delusions. (*Id.*) Her speech and thought processes and content were normal. (*Id.*) She had poor insight and judgment, but good impulse control. (*Id.*) Plaintiff denied having hallucinations, and reported she felt an improvement and was sleeping better. (*Id.*) O'Brien continued plaintiff's medications, and instructed plaintiff to return in one month or as needed. (*Id.*)

## C. Relevant Testimonial Evidence

The administrative hearing was held on June 15, 2016 in Central Islip, New York, before ALJ April M. Wexler. (AR at 26.) Plaintiff testified that she had a driver's license and could drive. (AR at 30.) She testified that she could not work due to back pain—which she said was so severe it prevented her from getting out of bed sometimes—psychological problems, and panic attacks. (AR at 33-34.) Plaintiff testified that her pain averaged seven out of ten, but could be as severe as ten out of ten. (AR at 47.) She took medication and received monthly anesthesia injections for her back and neck pain. (AR at 34-36, 39.) She had very weak legs, so her pain management doctor prescribed her a cane. (AR at 36.) Plaintiff testified that she could stand with her cane for support, for about 30 minutes, and could walk about a block. (AR at 48.) She had difficulty sitting for more than 20 or 30 minutes. (*Id.*) She was unable to bend because she would "need . . . two people to bring [her] up." (AR at 40.) Plaintiff visited a psychiatric nurse practitioner every month for medication management, and the nurse would provide counseling for about five minutes. (AR at 36-37.) Plaintiff testified that she had difficulty making decisions, remembering, and concentrating. (AR at 48-49.) Plaintiff's daughter even had to pick out her clothes for her. (AR at 49.)

With regard to activities plaintiff was capable of performing in a typical day, plaintiff testified that she did little things around the house, and that her oldest daughter "d[id] everything." (AR at 39.) Plaintiff testified that she napped every day, often for about three hours. (AR at 45.) She was able to help care for her younger children a little; she would feed and carry her youngest child, but that that was "pretty much it. (AR at 40.) She could not bend to bathe him, so her daughter or husband bathed him. (*Id.*) Plaintiff attended church. (*Id.*) She testified that she could not do any cleaning around the house, such as sweeping or mopping, and that this was "very, very disturbing" to her. (AR at 41.) She explained that her extreme pain and inability to do such tasks was aggravating her mental problems. (*Id.*) She said that the epidural steroid injections would help her with easy household activities, such as preparing mashed potatoes, for a few days, but not with anything more significant like cooking or cleaning. (*Id.*) Plaintiff denied having any hobbies. (AR at 42.) She described herself as "very friendly" and testified that she did not have difficulty socializing with others or interacting with the public. (AR at 46-47.)

Rocco J. Meola, a vocational expert ("VE"), also testified at the hearing. (AR at 49-51, 170-73 (curriculum vitae.) ) Mr. Meola classified plaintiff's past jobs as the following: a computer parts packager (Dictionary of Occupational Titles ("DOT") Code No. 739.687-182), which was a sedentary position with a Specific Vocational Preparation ("SVP") level of 2 and involved lifting no more than 10 pounds; and a packaging job (DOT Code No. 922.687-058) for Barrons, which was a medium-exertional position with an SVP of 2 and involved lifting approximately 50 pounds. (AR at 50.) The ALJ asked Mr. Meola to assume a hypothetical individual with the same age, educational background, and work history as

plaintiff, who was limited to sedentary work; could occasionally lift 10 pounds; could sit for approximately six hours; could stand or walk for approximately two hours in an eight-hour day with normal breaks; could occasionally climb ramps or stairs; could never climb ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, or crawl; had unlimited ability to push and pull; could never squat; was limited to simple, routine, repetitive tasks; was limited to low-stress jobs, meaning no work at a fixed-production rate pace; and needed to use a cane to walk. (AR at 51.) Mr. Meola testified that such an individual could perform plaintiff's past work as a computer parts packager, but not her other past work. (*Id.*) Mr. Meola testified that a hypothetical individual who had these limitations and could not bend at the waist would still be able to perform plaintiff's past work.

## II. PROCEDURAL BACKGROUND

### A. Administrative History

Plaintiff filed a Title II application for Social Security Disability Insurance Benefits on May 21, 2014, and filed a Title XVI application for supplemental security income on June 11, 2014, alleging in both applications disability as of October 1, 2013. (AR at 9.) Plaintiff's applications for benefits were denied on August 8, 2014, and upon reconsideration, and plaintiff requested a hearing before an ALJ. (*Id.*) Plaintiff appeared with counsel and testified at a hearing before ALJ April M. Wexler on June 15, 2016, in Central Islip, New York. (*Id.*; AR at 26.) Vocational expert Rocco J. Meola also testified at this hearing. (AR at 9.) On July 14, 2016, ALJ Wexler denied plaintiff's disability insurance benefits claim. (AR at 6-19.) On May 22, 2017, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (AR at 1.)

### B. The Instant Case

Plaintiff commenced this lawsuit on July 19, 2017. (ECF No. 1.) On January 25, 2018, plaintiff moved for judgment on the pleadings. (ECF No. 9.) The Commissioner submitted a cross-motion for judgment on the pleadings on March 28, 2018. (ECF Nos. 14-15.) On April 17, 2018, plaintiff responded to the Commissioner's cross-motion for judgment on the pleadings. (ECF No. 17.) The Court has fully considered the parties' submissions.

## III. STANDARD OF REVIEW

A district court may set aside a determination by the Commissioner "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374-75 (2d Cir. 2015) (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); 42 U.S.C. § 405(g)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Furthermore, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (citation omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not

substitute its judgment for that of the Commissioner.").

## IV. DISCUSSION

### A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the Social Security Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims.[1] *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment listed in Appendix 1 of the regulations. When the claimant

has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual function capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id.*

The Commissioner must consider the following in determining a claimant's entitlement to benefits: "(1) the objective medical facts; (2) diagnosis or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; (4) the claimant's educational background, age, and work experience." *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

### B. The ALJ's Ruling

In the instant case, the ALJ first noted that plaintiff met the insured status requirements of the Social Security Act through December 31, 2016. (AR at 11.) Next, at the first step in the five-step sequential process described *supra*, the ALJ determined that plaintiff had not engaged in substantial gainful activity since October 1, 2013, the date of the alleged onset of her disability. (AR at 12.) At step

---

[1] The ALJ performs this five-step procedure in the first instance; the Appeals Council then reviews the ALJ's decision and determines if it stands as the Commissioner's final decision. *See, e.g.*, *Greek*, 802 F.3d at 374.

two in the five-step process, the ALJ determined that plaintiff had the following severe impairments: back impairment and panic disorder. (*Id.*) At step three, the ALJ concluded that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (*Id.*)

At step four, the ALJ wrote that, after careful consideration of the entire record, she found that plaintiff had the residual functional capacity to perform sedentary work[2] as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), in that plaintiff could occasionally lift ten pounds, sit for approximately six hours, and stand or walk for approximately two hours in an eight-hour day with normal breaks; could occasionally climb ramps or stairs, but could never climb ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, or crawl; could perform unlimited pushing and pulling; could never squat or bend; was limited to simple, routine, repetitive tasks; was limited to low-stress jobs, meaning no work at a fixed-production rate pace; and needed to use a cane to walk. (AR at 12-13.)

In reaching this conclusion, the ALJ stated that she followed a two-step process, in which an ALJ first determines whether there is an underlying medically determinable physical or mental impairment. (AR at 13.) Second, after finding that an underlying physical or mental impairment that could be reasonably expected to produce

plaintiff's pain or other symptoms has been shown, the ALJ is required to evaluate the intensity, persistence, and limiting effects of plaintiff's symptoms to determine the extent to which they limit plaintiff's functioning. (*Id.*) When statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on the ALJ's consideration of the entire case record. (*Id.*)

The ALJ began her residual functional capacity analysis by stating that, after carefully considering all of the evidence, she found that plaintiff's medically determinable impairments "could reasonably be expected to produce the alleged symptoms," but plaintiff's statements about the intensity, persistence, and limiting effects of these symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.*)

Rather than separating her residual functional capacity analysis into two distinct sections (corresponding with the two-step process), the ALJ provided a single summary of plaintiff's testimony and medical evidence. (AR at 13-19.) She first discussed select statements from plaintiff's hearing testimony, noting that plaintiff "testified that she is unable to work due to back pain, which gives her weak legs and her mental disorder." (AR at 13.) The ALJ also noted that plaintiff took medication for her impairments, had had epidural injections, and saw a nurse practitioner for mental health medication.

---

[2] Sedentary work is defined as follows:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

(*Id.*) She wrote that plaintiff had daily panic attacks that would last for five to six minutes. (*Id.*) On the other hand, the ALJ noted that plaintiff "does not get any formal therapy" other than speaking with the nurse practitioner for about five minutes a month, described herself as a social person who had no difficulty getting along with others, and was able to drive, pick her child up from school, and walk with a cane. (*Id.*)

Next, the ALJ discussed plaintiff's medical records and the opinions of six of plaintiff's treating physicians and medical examiners. (AR at 13-19.) The ALJ stated that she gave "great weight" to the opinions of Drs. Herman and Pollack, and provided as her reason that both opinions were "based on a complete examination." (AR at 15.) The ALJ accorded this weight to Dr. Herman's records from his July 2, 2014 psychiatric evaluation of plaintiff, and Dr. Pollack's records from her August 1, 2014 internal medicine examination of plaintiff, in each of which the doctors noted that "[n]o doctor-patient relationship exists or is implied by this examination." (AR at 232-35, 238-41.) The ALJ concluded her synopsis of Dr. Herman's opinion by summarizing that he assessed that plaintiff's psychiatric problems "did not appear to be significant enough to interfere with [her] ability to function on a daily basis to the extent that vocational functioning would be precluded." (AR at 15.) Similarly, the ALJ noted a number of Dr. Pollack's findings—including that plaintiff could walk normally, used no assistive devices, and received a stable prognosis—that supported the doctor's assessment that plaintiff had "a mild to moderate restriction" with respect to certain activities, and a marked restriction with respect to others (e.g., squatting and lifting). The ALJ noted specific findings that were the basis for these limitations, such as that plaintiff had limited range of motion in her spine, hips, and knees, had severe neck and back pain, and physical therapy and injections had provided no relief. (*Id.*)

On the other hand, the ALJ stated that she gave "little weight" to N.P. O'Brien's opinion, explaining that it was inconsistent with other record evidence, plaintiff's own testimony, and plaintiff's work history; it was "based on very limited treatment records and only a two-month treatment relationship"; and "O'Brien is not an acceptable medical source." (AR at 16.) The ALJ noted that O'Brien's opinion discussed, among other issues, plaintiff's agitation, difficulty concentrating, hallucinations, paranoid thinking, hyperactivity, distractibility, lack of ability to deal with the public, and limitations with respect to "following work rules, relating with coworkers, interacting with supervisors, maintaining attention . . . [and] carrying out simple job instructions," among others. (AR at 15-16.) She also noted that O'Brien discussed plaintiff's restricted activities of daily living, and that plaintiff has lived with many of these issues since childhood, and found this evidence to be inconsistent with other evidence and merit little weight. (AR at 16.)

The ALJ did not explicitly state the weight she assigned to the other medical opinions—Dr. Szerlip's in particular—but it is apparent from her conclusion of this analysis that she considered certain (but not others) of Dr. Qadeer and Dr. Leddy's notes in arriving at her conclusion that plaintiff "retain[ed] the capacity to function adequately" to perform sedentary work, with the limitations noted above. (AR at 17-18.) The ALJ also pointed to specific medical records in support of her conclusion, such as records reflecting improvement in plaintiff's back condition after epidural steroid injections, with medication, and over time (AR at 17), and progress notes from the Sunrise Counseling Center indicating that

plaintiff "slept better," "had a happy mood," and was "overall improved" (AR at 18).

Based on this evidence, the ALJ states that "[t]he residual functional capacity accounts for the vocational limitations that would be placed upon [plaintiff] based on her medically determinable impairments," including her back condition and panic disorder. (*Id.*) For example, the ALJ explained, the limitations that plaintiff would lift no more than ten pounds, and only occasionally, and would only occasionally be required to perform activities such as balancing, stooping, and kneeling, accounted for her back impairment. (*Id.*) Plaintiff's need to walk with a cane was also accommodated. (AR at 19.) The limitation that plaintiff could only perform simple, low-stress jobs accommodated her issues with concentration and stress. (*Id.*)

Concluding her residual functional capacity analysis, the ALJ determined that, taking plaintiff's limitations into account, plaintiff was capable of performing her past relevant work as a packager of small parts.[3] (*Id.*) The ALJ found that plaintiff was, therefore, not disabled from the onset of her disability on October 1, 2013, through the date of the ALJ's decision. (*Id.*)

C. Analysis

Plaintiff challenges the ALJ's decision, finding that plaintiff has not been disabled since October 1, 2013, and denying her disability insurance benefits. Specifically, plaintiff asserts that the ALJ (1) failed to properly evaluate the medical evidence, and (2) improperly assessed the vocational expert's evidence. As set forth below, first, the Court agrees that the ALJ failed to properly evaluate the medical evidence for one of the reasons plaintiff asserts in her

motion. As plaintiff argues, the ALJ failed to provide good reasons for not crediting plaintiff's treating physicians' opinions and for assigning controlling weight to two of the medical examiners' opinions. Second, the Court concludes that the ALJ improperly considered the vocational expert's evidence by relying on testimony that plaintiff would be able to perform a job that, as described in the DOT, did not fit her past work (which would actually be classified as medium work). Additionally, both the job the expert identified and plaintiff's past work would require plaintiff to work at a fixed-production rate pace, which the ALJ's own residual functional capacity determination specified plaintiff was unable to do.

Thus, remand is warranted, and the Court need not, and does not, address plaintiff's argument that the ALJ failed to properly evaluate the medical evidence in making her determination as to plaintiff's residual functional capacity. Additionally, based on its review of the ALJ's decision, the Court concludes that the ALJ did not err in her determination with regard to the severity of plaintiff's cervical impairment (but directs the ALJ clarify this portion of her decision on remand).

1. Failure to Properly Evaluate the Medical Evidence

a. Step Two Assessment of Severity of Impairments

Plaintiff argues that the ALJ erred in failing to find that her cervical impairment was a "severe impairment." Based on the Court's review of the ALJ's decision, however, the Court agrees with the Commissioner that the ALJ intended her finding that plaintiff's "back impairment" was a severe impairment (AR at 12) to

---

[3] In light of the ALJ's determination that plaintiff was capable of performing her past relevant work, she did not need to move to the final step of the five-step process to determine whether plaintiff was capable of performing any other work.

include both plaintiff's lumbar and cervical spine impairments. ALJs will often note where they find that only certain alleged impairments qualify as severe. *See, e.g., Ridge v. Berryhill*, 294 F. Supp. 3d 33, 53 (E.D.N.Y. 2018) (noting that the record showed a history of plaintiff's other alleged impairments, and explaining why they did not qualify as severe); *Miracolo v. Berryhill*, 286 F. Supp. 3d 476, 492 (E.D.N.Y. 2018) (same). Here, the ALJ did not specify that she found plaintiff had a severe impairment in only part of plaintiff's back, or that her finding did not extend to plaintiff's alleged cervical impairment. Further, the ALJ discussed plaintiff's cervical impairment in her discussion of plaintiff's residual functional capacity, for instance referring to plaintiff's cervical spine MRIs and Dr. Szerlip's diagnoses of cervical disc displacement, cervical radiculopathy, and cervical muscle spasms. (*See* AR at 13-14, 16.) In the ALJ's summary of the residual functional capacity analysis, where she discusses improvements in plaintiff's conditions and her determination that plaintiff suffered from severe impairments but retained the capacity to perform many basic work activities, the ALJ specifically notes Dr. Leddy's report that plaintiff had full range of motion of the neck. (AR at 17.) Thus, although the ALJ did not specify at step two that plaintiff's back impairment included her cervical impairment, the Court concludes that this impairment was one that the ALJ deemed at that stage to be severe.

Regardless, even if the Court were to accept plaintiff's argument that the ALJ did not make this specific finding, that alleged error would not be grounds for remand. Where an ALJ fails to note a particular impairment at step two, if the ALJ finds other severe impairments and considers the omitted impairment in the subsequent steps, "any error was harmless." *O'Connell v. Colvin*, 558 F. App'x 63, 65 (2d Cir. 2014) (citing 42

U.S.C. § 423(d)(2)(B) (requiring consideration of "the combined effect of all of the individual's impairments")). Thus, the ALJ's omission was harmless given that she considered plaintiff's cervical impairment in the remainder of her analysis. However, in light of the Court's determination that this case shall be remanded for the reasons discussed *infra*, the Court directs the ALJ to clarify in her next ruling whether she intends to include plaintiff's cervical impairment as one of her severe impairments.

b. Treating Physician Rule

Plaintiff argues that the ALJ erred in applying the treating physician rule, and thereby improperly weighed the medical evidence. Based on the weight the ALJ stated and appears to have assigned to the different medical opinions in the record, the Court agrees.

The Commissioner must give special evidentiary weight to the opinion of the treating physician. *See Clark*, 143 F.3d at 118. The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see also, e.g.*, *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *Clark*, 143 F.3d at 118. The rule, as set forth in the regulations, provides:

> Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual

examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairments(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Although treating physicians may share their opinions concerning a patient's inability to work and the severity of the disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." *Id.* § 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the ALJ must apply various factors to decide how much weight to give the opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118. These factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship, (ii) the evidence in support of the opinion, (iii) the opinion's consistency with the record as a whole, (iv) whether the opinion is from a specialist, and (v) other relevant factors. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Clark*, 143 F.3d at 118. When the ALJ chooses not to give the treating physician's opinion controlling weight, he must "give good reasons in [his] notice of determination or decision for the weight [he] gives [the claimant's] treating source's opinion." *Clark*, 143 F.3d at 118 (quoting C.F.R.

§§ 404.1527(d)(2), 416.927(d)(2)); *see also Perez v. Astrue*, No. 07-cv-958 (DLI), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources." (citation omitted)). A failure by the ALJ to provide "good reasons" for not crediting the opinion of a treating physician is a ground for remand. *See Snell*, 177 F.3d at 133; *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

Here, remand is appropriate because the ALJ failed to give "good reasons" for according less than controlling weight to the opinions of plaintiff's treating physicians, and for according greater weight to two of the medical examiners' opinions.

First, the Court finds that the ALJ failed to provide sufficient reasons for appearing to give less than controlling weight to treating physicians Drs. Leddy, Szerlip, and Qadeer, and giving "little weight" to the opinion of N.P. O'Brien. With respect to Dr. Leddy, plaintiff's primary care physician, the ALJ does not state the weight she assigns to his testimony and discusses the records from only two of his many visits with plaintiff.

The ALJ discusses plaintiff's pain and other symptoms as Dr. Leddy noted at the October 2, 2014 visit (AR at 15), then discusses portions of Dr. Leddy's reports from the November 5, 2015 visit showing significant improvement (AR at 17 (noting findings including that plaintiff had full range of motion in her neck, grossly normal muscle tone and strength, and full and painless range of motion of all major muscle groups)). The ALJ references the latter report again in concluding that plaintiff's conditions had improved, and her impairments would not preclude her from working. In referring to only select notes from these two visits, the ALJ failed to discuss the records from plaintiff's numerous other visits with Dr. Leddy from 2013 through 2015 that indicated serious ongoing medical issues. For instance, the ALJ failed to discuss Dr. Leddy's records from November 4, 2015—just a day before the visit at which the ALJ depicted plaintiff as in relatively good condition—in which Dr. Leddy reported that plaintiff had paresthesia in her upper extremities and referred plaintiff to a chronic pain specialist. (AR at 373.)

Similarly, the ALJ does not state the weight assigned to pain management doctor Szerlip's records, and—based on the ALJ's conclusion of her analysis in this section—appears to accord them little weight. The ALJ only briefly notes that plaintiff saw Dr. Szerlip from January through May 2014, and that Dr. Szerlip indicated that plaintiff suffered from neck and back pain (among other physical ailments), had experienced a 30% improvement from an epidural injection, and was diagnosed with cervical disc displacement, cervical radiculopathy, and cervical paraspinal muscle spasms. (AR at 14.) There is notably no discussion of these records in the ALJ's conclusion.

The ALJ also failed to state the weight she accorded to pain management doctor Qadeer's records, although she discusses them more extensively in her decision and references them in her conclusion as support for finding that plaintiff's condition was improved. She discusses the following of Dr. Qadeer's records: records from June 2014, noting that plaintiff was experiencing neck and back pain, and had limited range of motion of the cervical and thoracolumbar spine, among other conditions (*id.*); records from October 2014, noting that plaintiff's "[l]umbar back pain [wa]s much better after epidural steroid injections" (AR at 16); and records from February through July 2015, noting complaints of pain at some visits, while at others plaintiff had no new complaints, or even reported that she was doing well and the medication was helping (*id.*). In concluding her residual functional capacity analysis, the ALJ noted that in Dr. Qadeer's records from March through May 2016, plaintiff reported that medications and injections were helping her with the pain, she experienced functional improvement, and she had "no new complaints during that time and stated that [her] neck pain does not bother her too much." (AR at 17.) The ALJ does not, however, address that in visits including one as late as the end of May 2016, plaintiff's complaints indicated much greater pain and limitations. At that May 23, 2016 visit, for instance, plaintiff reported that the week before she had "excruciating" pain and "could hardly move." (AR at 430.) Although the ALJ noted that plaintiff reported at that visit that the injections helped "take the edge off" her pain, the ALJ does not note that plaintiff made that statement after reporting that the medication did not help much. (*Id.*)

The ALJ provided her reasons for giving less than controlling weight to the nurse practitioner's opinion, but did not "articulate good reasons" for according less than controlling weight to the opinions of the treating physicians that indicated that plaintiff's conditions were more severe than the ALJ ultimately concluded. *Perez*, 2009

WL 2496585, at *8. The ALJ noted, in her conclusion, that there were inconsistencies within the record evidence, such as the fact that plaintiff stated at certain visits that the injections did not help her, but also reported that she was able to cook three times per week and shower and dress daily. (AR at 18.) This explanation for the ALJ's determination as to which evidence to credit does not provide the requisite "good reasons" for discounting the evidence that these treating physicians provided, as opposed to other record evidence.

Finally, looking to the ALJ's treatment of the nurse practitioner's opinion, the Court recognizes that the ALJ was not required to give her opinion controlling weight, but notes that the ALJ nonetheless should have considered it as among the "other sources" whose opinions may be considered in this analysis. *See Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) ("[N]urse practitioners and physicians' assistants are defined as 'other sources' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight." (citing 20 C.F.R. § 416.913(d)(1))). The ALJ explained that she gave little weight to N.P. O'Brien's opinion because—in addition to the fact that she did not consider O'Brien to be an acceptable medical source—(1) she found O'Brien's opinion to be inconsistent with other record evidence, and (2) it was based on limited treatment records and only a two-month treatment relationship. (AR at 16.) First, the Court notes that the length of this treating relationship was far longer than the amount of time the medical examiners spent with plaintiff before forming their opinions (to which the ALJ assigned great weight). Second, for the reasons previously discussed in reference to the other treating physician opinions, the Court does not find that the ALJ articulated good reasons in selecting which portions of what she found to be contradictory record evidence to credit. O'Brien's records—which the ALJ found to be inconsistent with the evidence she credited—are consistent with much of the evidence from the treating physicians that the ALJ chose to discredit without adequate explanation. Thus, given the lack of good reasons for not crediting the treating physicians' opinions (and that of the nurse practitioner), the Court concludes that the ALJ's determination failed to satisfy the treating physician rule.

The Court also finds that the ALJ improperly accorded controlling weight to medical experts Drs. Herman and Pollack's opinions. The Second Circuit has indicated that, by extension of the treating physician rule, ALJs should not rely heavily on findings by examiners based on a single examination. *Selian*, 708 F.3d at 419. In *Selian*, the ALJ rejected the treating physician's diagnosis based in part on the opinion of another physician who "performed only one consultative examination." 708 F.3d at 419. The Court held that, in doing so, the ALJ "fail[ed] to provide 'good reasons' for not crediting [the treating physician's] diagnosis," and that failure "by itself warrant[ed] remand." *Id.* In *Cruz v. Sullivan*, the Second Circuit explained that "a consulting physician's opinions or report should be given limited weight . . . because 'consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" 912 F.2d 8, 13 (2d Cir. 1990) (citation omitted). Although amended regulations guiding ALJs in evaluating medical opinions now permit non-examining sources' opinions to override treating sources' opinions, that is still with the limitation that the overriding opinions must be "supported by evidence in the record." *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir.

1993) (citing 20 C.F.R. §§ 404.1527(f), 416.927(f)). The Second Circuit explained that the amended regulations "continue to give deference to the opinions of treating physicians based on the view that opinions based on a patient-physician relationship are more reliable than opinions based, say, solely on an examination for purposes of the disability proceedings themselves." *Id.*

As stated *supra*, Drs. Herman and Pollack noted in the records from their one-time evaluations that "[n]o doctor-patient relationship exists or is implied by this examination." (AR at 232-35, 238-41.) The ALJ noted mixed findings from Dr. Herman's reports, discussing plaintiff's psychiatric condition, including claustrophobia and panic, but also that her thought processes were coherent and that she was oriented. (AR at 14.) The ALJ finished discussing Dr. Herman's opinion by summarizing that he assessed that plaintiff's psychiatric problems "did not appear to be significant enough to interfere with [her] ability to function on a daily basis to the extent that vocational functioning would be precluded." (AR at 15.) The ALJ also noted mixed findings with respect to plaintiff's condition in Dr. Pollack's records. She discussed Dr. Pollack's examination results, including that "[p]hysical examination revealed limited range of motion," and the doctor diagnosed neck and lower back pain, panic disorder, claustrophobia, and found that plaintiff had a mild and marked

restriction as to certain physical activities (such as squatting and bending, as discussed *supra*). (*Id.*) Although the ALJ pointed to evidence based on the doctors' examinations of plaintiff, she still failed to explain why the portions of these opinions that she chose to credit would override the treating physicians' evidence. It is, therefore, unclear why the ALJ determined that plaintiff could work despite portions of the record—such as descriptions of her "excruciating" pain, which impacted plaintiff so intensely that she "could hardly move" (AR at 430)—that suggest otherwise.

In sum, the ALJ failed to provide "good reasons" for declining to accord controlling weight to the treating physicians' opinions. *Snell*, 177 F.3d at 133. That failure "by itself warrants remand."[4] *Selian*, 708 F.3d at 419.

2. Failure to Properly Assess the Vocational Expert's Evidence

Given that the Court is remanding this case for further proceedings, the Court only briefly discusses the ALJ's allegedly improper reliance on the vocational expert's testimony. First, plaintiff argues that the description of the job the vocational expert identified in the DOT as matching plaintiff's past relevant work packaging small electronic parts—a packager of small parts, table worker (DOT Code No. 739.687-182)—does not, in fact, match the work plaintiff performed at her electronic parts packaging job. With respect to her actual

---

[4] Plaintiff argues that the ALJ failed to properly weigh the medical evidence not only by assigning greater weight to the medical examiners' opinions than to those of her treating physicians, but also by incorrectly evaluating her residual functional capacity. In support of this second argument, plaintiff states again that the ALJ relied primarily on the opinions of the medical examiners (Drs. Herman and Pollack), and that their opinions were vague and the ALJ, therefore, had a duty to further develop the record. The Court finds this argument to be largely duplicative. Regardless, in light of the Court's ruling that the ALJ erred in failing

to give "good reasons" for according less than controlling weight to the treating physicians' opinions, the Court need not address plaintiff's other arguments with respect to the ALJ's failure to properly weigh the medical evidence at this time. The Court, thus, declines to do so, but directs the ALJ on remand to reconsider plaintiff's residual functional capacity. *See McAllister v. Colvin*, 205 F. Supp. 3d 314, 330 n.3 (E.D.N.Y. 2016); *Morris v. Colvin*, No. 15-CV-5600 (JFB), 2016 WL 7235710, at *10 (E.D.N.Y. Dec. 14, 2016).

work activities in that job, plaintiff explains that she worked sitting and standing and was never required to lift more than ten pounds. The vocational expert classified her past job as a packager of small parts or a table worker, a sedentary position with an SVP of 2. Plaintiff explains that the DOT job description—examining squares or tiles passed along on a conveyor and replacing missing or substandard pieces—"has virtually no resemblance" to the work she actually performed. Plaintiff identified another DOT job description that she claims better fit her past work packaging electronic parts—that of a hand packager (DOT Code No. 920.587-018), which involves manually packaging materials and performing any combination of duties including cleaning containers, lining crates, assembling cartons, sorting products, regulating conveyor speed, and labeling and packing, among other activities—and notes that this is classified as medium work, although plaintiff performed it at the sedentary level.

Second, plaintiff argues that, based on the ALJ's own assessment that plaintiff's residual functional capacity does not allow for her to perform fixed-production rate tasks, plaintiff is not capable of performing either her past job or the DOT job the vocational expert identified. The ALJ specifically determined that plaintiff was capable of "perform[ing] low-stress jobs, meaning no work at a fixed production rate pace." (AR at 13.) Both the vocational expert's proposed job and what plaintiff claims was her actual past relevant work would require her to work at a fixed-production rate pace: the expert's proposed job involves examining and replacing tiles on a conveyor belt; and plaintiff described her actual past work as a conveyor belt or assembly-line occupation. The Court agrees that both of these jobs would appear to require plaintiff to work at a fixed-production rate pace and, as such, to perform work that

the ALJ deemed to be outside of plaintiff's residual functional capacity. *See Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003) ("[I]n the fourth stage of the SSI inquiry, the claimant has the burden to show an inability to return to her previous specific job *and* an inability to perform her past relevant work generally." (citations omitted)).

Thus, the Court directs the ALJ, on remand, to reexamine the DOT job description that fits plaintiff's past relevant work. After reconsidering plaintiff's residual functional capacity (as discussed *supra*), the ALJ should determine whether plaintiff would, in fact, be capable of performing her past relevant work (or, if not, the ALJ should proceed to determine at step five whether plaintiff is capable of performing any other work).

## V. CONCLUSION

For the reasons set forth above, plaintiff's motion for judgment on the pleadings is denied. The Commissioner's cross-motion for judgment on the pleadings is also denied. The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

SO ORDERED.



JOSEPH F. BIANCO
United States District Judge

Dated: September 28, 2018
Central Islip, New York

***

Plaintiff is represented John W. DeHaan of the DeHaan Law Firm P.C., 300 Rabro Drive East, Suite 101, Hauppauge, New York 11788. The Commissioner is represented by Assistant United States Attorney Rukhsanah L. Singh of the U.S. Attorney's Office, 271 Cadman Plaza East, Brooklyn, New York 11201.